INFORMATION CLEARING
HOUSE, INC., Plaintiff,

v.

FIND MAGAZINE and Jack
Linder, Defendants.

No. 80 Civ. 1505.

United States District Court,
S. D. New York.

May 2, 1980.

Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, for plaintiff; David H. T. Kane, Siegrun D. Kane, Virginia R. Richard, New York City, of counsel.

Kass, Goodkind, Wechsler & Labaton, New York City, for defendants; Arthur H. Seidel, Roberta L. Jacobs, Seidel, Gonda, Goldhammer & Panitch, P. C., Philadelphia, Pa., of counsel.

### OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Information Clearing House, Inc. ("Information"), is the owner of the registered trademark "FIND," used in connection with its business of "providing computerized information retrieval services on a subscription basis." It also owns the registered trademark "FINDOUT," used for a "newsletter relating to the furnishing of business information and research in connection therewith." The defendants are the corporate publisher and the chief executive officer of a newly-launched publication, "Find Magazine," of which one issue has been distributed to date with the logotype on the front page as follows:

"find
M A G A Z I N E"[1]

Plaintiff commenced this action charging that the defendants' use of "find" constitutes trademark infringement,[2] unfair competition,[3] dilution of plaintiff's mark, and

---

1. This logotype also appears on all advertising and other promotional material issued in connection with the magazine. In the opinion, however, the reference thereto is "Find Magazine."

2. 15 U.S.C. § 1114(1).

3. 15 U.S.C. § 1125(a).

tarnishment of its reputation;[4] it seeks injunctive relief against defendants' continued use of the word "find" in its magazine title and in promotional and advertising materials. The defendants counterclaimed, seeking cancellation of plaintiff's two trademarks "Find" and "Findout" upon a claim that they are generic words not entitled to trademark protection.[5] Pursuant to Rule 65(a)(2) and by stipulation of the parties, the hearing on plaintiff's motion for a preliminary injunction was consolidated with the trial on the merits.

After a word-by-word study of the trial transcript, examination of the trial exhibits, the Court's contemporaneous trial notes, which include an appraisal of the witnesses and their demeanor, an evaluation of the pertinent factors, and upon the totality of the testimony and documentary evidence, I find that each litigant, as to its respective claims, has failed to sustain its burden of proof to warrant the requested relief.

### Plaintiff's Business

Andrew Garvin, plaintiff's principal, founded Information in 1969; its initial purpose was to provide "customized research service[s]" to retainer clients. These subscribers now number approximately 6,000, comprising almost exclusively corporations and businesses in the New York Metropolitan area. From its inception, plaintiff adopted the name "FIND." By the mid-1970's, Information, in pursuit of its goal of becoming a "total information resource," had expanded its operation into a tripartite enterprise. Plaintiff's essential business remained, as it always had been and continues to be, the provision of "quick information" or "information retrieval" to retainer clients. Most of this information is provided in rapid response to telephoned requests of clients. The information supplied covers a wide spectrum of diverse subjects of a commercial, technical, economic and cultural nature. Plaintiff responds to a customer's request by supplying an oral, telephoned answer, sometimes supplemented with appropriate written documents.

The second largest component of the business is "project research," by which plaintiff provides longer, more detailed, and generally written responses to questions or information requests propounded by clients. This, too, is "customized research" and its scope is defined by the client's needs. Again the range of information sought is wide and diverse—for example, it may include reports on hair conditioners, location of recipes for fish house punch, to monthly updates on the machine tool industries.

The third component of the plaintiff's business, which it refers to as the "publications area," and about which this controversy centers, consists of three disparate elements. These are: (1) a monthly newsletter called "Findout" which for the most part contains information about the various services provided by plaintiff and is distributed free to all of plaintiff's retained clients, to various businesses and institutions throughout the country, and in some instances, sold to others; (2) an annual publication entitled "Findex," sold to fewer than 2,000 customers at a cost of $89.50 per copy, which lists recent publications of a commercial and technological nature, with a brief synopsis of each; and (3) various other "studies" or "reports" on topics selected by the plaintiff itself, appearing in booklet or book form and sold at fixed prices. These studies cover a broad range of subjects, including surveys of the CB radio industry (of which 200 copies have been sold), weight control market, prescription eyeglass market, vitamins, mouth washes, breath sprays, bottled water industry and a "Handbook of Construction Resources & Support Services."

These studies and reports published by the plaintiff range in size from 15 to 1400 pages, and in price from $1.00 to $950.

---

4. N.Y. General Business Law, § 368–d. The parties are in agreement that New York law applies to the common law claims of unfair competition and dilution.

5. See 15 U.S.C. §§ 1064 (1963) and 1065(4) (Supp.1980).

Many of the publications sell for more than $100 apiece, and the vast majority, for more than $25. All deal with narrow topics of interest primarily to small, selected segments of the business community. The availability of these publications is advertised both in plaintiff's newsletter "Findout" and in other promotional pieces. Although the plaintiff has at times sent promotional literature to the homes of selected professionals, whose names were drawn from subscriber lists, there was no evidence that any item purchased from the plaintiff was mailed to a home address. None of the plaintiff's publications is sold at newsstands.

The "publications area" of plaintiff's business has become its second largest program and is steadily increasing in size and importance. During fiscal year 1979 plaintiff grossed approximately $500,000 from the sale of its publications. This represents approximately twenty percent of all revenues generated by Information during that year. Plaintiff anticipates continued growth for Information's publications area; in 1980 it is expected that it will sell more than 2,000 copies of Findex and gross more than $650,000 from the sale of publications.

No evidence was offered to show what portion of these amounts could be attributed to sales of Findex, of Findout, or of the plaintiff's published studies on selected topics. The "overwhelming majority" of the $10 million generated in sales by Information during its ten-year life is attributable to its "custom information" service, and less than ten percent of its sales revenue during that time had been generated by its publications. During this period, the "prime business," comprising the "bulk" of plaintiff's enterprise,[6] consisted of either telephoned responses or correspondence responses to particular inquiries. The majority of this information was furnished to "the marketing and planning departments of companies and other business organizations." Plaintiff, since 1970, has spent in

excess of $1,000,000 for advertising and promotion but no evidence has been presented to show what portion was spent on its essential informational business as compared to its publications. Its only two radio announcements in 1976 were directed to its informational service and no radio advertising has been directed to any publication.

Plaintiff contends that each of its publications, as well as the countless circulars used to advertise its services, contains its registered mark "Find" displayed in a prominent position. The evidence does not support that claim. Although there are a number of instances in which the word "Find" appears alone on a cover page or in the text of one of plaintiff's publications, in the vast majority of instances it appears as part of another word, or coupled with other letters. The most common configurations are the words "Findout" and "Findex," in which plaintiff's mark "Find" is submerged into other, separate words. When "Find" appears in forms other than these two titles, it is almost invariably coupled with the letters "SVP"—thus, "Find/SVP." [7]

**Find**/SVP

Garvin, plaintiff's chief executive officer, was unable to cite a single periodical or publication issued by the plaintiff whose source was not attributed to "Find/SVP," rather than merely to "Find."

### The Defendants' Business

It is not disputed that the defendants are the junior users of the mark, and that plaintiff's use of it predates theirs by more than a decade. The premier issue of Find Magazine appeared in March 1980, approximately one month after this lawsuit had commenced and only days before the trial. Those most active in the magazine's publication are the defendant Jack Linder, its publisher, and Ms. Sheila Jacobson, its editor. Each has had substantial experience in the production and sale of English language periodicals directed to segments of the Jew-

---

6. Trial record pp. 87, 91.

7. The SVP designates an umbrella, information-gathering agency, centered in France, with which plaintiff has a relationship.

ish population. The concept of Find's founders was a magazine of high quality for the Jewish community which would have an editorial mix designed to involve both deeply committed Jews and Jews who had never explored their roots and would include the widest possible variety of topics, including politically controversial matters, personal profiles, fashion closeups, food and local events of interest. Linder concluded that such a magazine would have the best chance of success in the few communities of the United States with a high diversity of Jewish population. He testified and the Court accepts as fact that he and his associates considered more than 500 possible names before fastening upon "Find Magazine." Ultimately, the word "Find" was chosen both because it was monosyllabic and because it suggested the searching, introspective quality that the magazine's editors attributed to the young Jewish community of suburban America. A kit and brochure were distributed to potential investors and advertisers which contained the "Find Magazine" logo and a description of the nature and content of the proposed publication. By the end of 1979 financing had been obtained from investors to the extent of $600,000.

The defendants decided to sell and distribute the magazine in two geographical areas having high concentrations of the magazine's intended readership: Long Island and the Greater Delaware Valley, each with a Jewish community of 650,000 and 400,000 persons, respectively. The first editions of the magazine distributed to those two areas were quite similar, except that each had an additional section with local features geared to the interests of the people in the particular region of distribution. The Long Island edition of Find Magazine is projected as a monthly publication; and the Delaware Valley edition, a quarterly. Of the magazine's first (March 1980) edition, approximately 84,000 copies were mailed without charge and for promotional purposes to Jewish families living in the Long Island area; 1,300 copies were sent to paid subscribers living in the area; and about 10,000 were sent to area newsstands for sale. In addition, 46,000 copies of the Delaware Valley edition were sent gratis to households in that area, and 4,500 were sent for sale at newsstands.[8]

Although the principal method chosen to promote the magazine was the free distribution itself, the defendants have also spent between $125,000 and $150,000 on other promotional devices, including the prospectus distributed to philanthropists, a bulletin mailed to more than 100,000 Jewish families on Long Island and in Queens in January 1980, advertisements in a Long Island newspaper, and a radio jingle played on a Long Island radio station.

So far, the initial promotional efforts have generated a folder of laudatory letters, but only 1,300 subscriptions. All of these are for families and individuals; the magazine has no corporate subscribers. In addition, an unspecified number of copies of the magazine have been sold at local newsstands. Individual copies cost $1.50 apiece.

*The Parties' Contentions*

Plaintiff's essential contention is that the defendants' use of the word "find" in its title and logo is likely to cause confusion among consumers concerning the origins of the parties' products. This confusion plaintiff contends is exacerbated by the common practice in the publishing industry of magazines being associated with information retrieval services; for example, it points to the fact that *The New York Times* has an information service known as *The New York Times Information Service* and that other publications, including *Newsweek* and *Time Magazine*, follow the same practice, whereby service and publication use a common name.

As a corollary to its claim of public confusion over the source of the parties' products

8. The defendants purchased address lists of Jewish families in the Long Island and Delaware Valley areas, which they used in selecting the particular families to which they sent their publications.

and services, the plaintiff also charges that it will be subject to irreparable injury. Here its argument is two-pronged. It contends that the failure rate of newly launched magazines is extremely high, 90 percent, and if Find Magazine suffers the fate of most, this will reflect adversely on plaintiff by tarnishing its reputation should its name be associated with a failed venture. On the other hand, should Find Magazine succeed, plaintiff opines, it nonetheless will so dilute plaintiff's mark as to render it "virtually worthless." Here the thrust of its argument is that it enjoys a reputation based on its ability to provide information and publications that are accurate, factual and devoid of reference to personal, political, religious or racial viewpoints. It pictures Find Magazine as sensationalistic, controversial and committed to a particular cultural and ethnic view which reflects a biased rather than an objective attitude. In this circumstance plaintiff contends that public identification of the magazine as originating with it will damage its reputation for objectivity and impartial reporting.

The defendants, in resisting plaintiff's various contentions, argue that essentially their magazine is a product entirely distinct from the information service and publications offered by plaintiff; that each operates in a different market, appealing to a separate set of customers with entirely distinct interests. In addition, defendants claim that Information's use of the mark is generic or descriptive and thus not entitled to protection; that the marks used by the parties are readily distinguishable in both substance and design; and that both parties' respective customers are sufficiently sophisticated to differentiate between the products and their origins.

*Discussion*

■ We begin with the oft-repeated observation that the essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is "whether a substantial number of ordinarily prudent purchasers are likely to be misled or confused as to the source of the different products." [9]

■ The answer turns on an analysis of various factors identified by the Court of Appeals to be assessed whenever a senior user contends that it is entitled to protection against a junior user of the mark on non-competitive items. [10] These factors include, but are not limited to:

> the strength of [the prior user's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defend-

---

9. *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), aff'd, 580 F.2d 44, 47 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (footnote omitted). *See id.* 580 F.2d at 47 ("[T]he crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") *Accord McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir. 1956); *Habitat Design Holdings Ltd. v. Habitat, Inc.,* 436 F.Supp. 327, 334 (S.D. N.Y.1977); *Jean Patou Inc. v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861, 863 (S.D.N.Y. 1962), aff'd, 312 F.2d 125 (2d Cir. 1963).

10. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Other courts have repeatedly analyzed trademark infringement claims in light of these factors. *See, e. g., McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979); *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220, 1225–26 (S.D.N.Y.1977), aff'd, 580 F.2d 44 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Habitat Design Holdings Ltd. v. Habitat, Inc.,* 436 F.Supp. 327, 331 n. 5 (S.D.N.Y. 1977); *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 409 (S.D. N.Y.1974); *Field Enterprises Educ. Corp. v. Grosset & Dunlap, Inc.,* 256 F.Supp. 382 (S.D. N.Y.1966).

ant's product, and the sophistication of the buyers.[11]

The determination is made on the basis of "the equities involved"[12] and the scope of inquiry takes into account three interests—that of the user, the junior user and the public consumer.[13] Against the background of these concerns we assess the parties' respective contentions.

(1) *Strength of the mark*

■ As the Court of Appeals has recently reminded us:

[t]he term "strength," as applied to trademarks, refers to the *distinctiveness* of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.[14]

A mark can fall into one of four general categories, which, in order of ascending strength, are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanci-ful.[15] The strength of a mark is dependent both upon its place on the scale, and whether it has acquired secondary meaning. Marks in the first two categories are inherently weak. Generic marks, which refer to "the genus of which the particular product is a species,"[16] cannot be registered and receive no protection under the trademark laws.[17] Descriptive marks are those which "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods."[18] They can be registered and are protectible only if they have acquired "secondary meaning"—that is, if "the[ir] primary significance . . . in the minds of the consumers is the identification of the producer, not a designation of the product."[19]

■ Marks in the remaining categories may be registered even without proof of secondary meaning. The truly strong marks are: those which are "fanciful," a classifying concept which applies to coined

11. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

12. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir. 1979); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964).

13. *Scarves By Vera Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2d Cir. 1976). *See also American Footwear Corporation v. General Footwear Company Ltd.*, 609 F.2d 655, 664 (2d Cir. 1979); *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964).

14. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979) (emphasis added).

15. *Id.* at 1130; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979).

16. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

17. *Id.* ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.") *See also Reese Publishing Co. v. Hampton International Communications, Inc.*, 620 F.2d 7, 12–13, (2d Cir. 1980); *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 15 (2d Cir. 1975); *S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 & n. 4 (1st Cir. 1979) (citing cases).

18. *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D. N.Y.1968), *cited with approval in Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976), *and in West & Co., Inc. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir. 1977). *See Habitat Design Holdings Ltd. v. Habitat, Inc.*, 436 F.Supp. 327, 331 n. 5 (S.D.N. Y.1977).

19. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979) (citing cases). *Cf. Exquisite Form Indus. Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 410 (S.D.N.Y.1974) ("A secondary meaning exists when a party through advertising, massive exposure, or the distinctive quality of its product has established its mark in the minds of consumers as an indication of origin from one particular source."); *Continental Corrugated Container v. Continental Group*, 462 F.Supp. 200, 205 (S.D.N.Y.1978).

words, invented solely for use as trade-marks; or "arbitrary," which refers to common words applied in an unfamiliar way.[20] In between these and the inherently weak ones is the category of "suggestive" marks, which is a repository for those fitting none of the other criteria. As Judge Friendly has observed, the "suggestive" category "was spawned by the felt need to accord protection to marks that are neither exactly descriptive on the one hand nor truly fanciful on the other."[21] A suggestive mark is one from which "it requires imagination, thought and perception to reach a conclusion as to the nature of the goods."[22] It is into this last category, which is a buffer between the strongest marks and the weak, that, based upon the relevant and material evidence, we put the word "Find," as used by the parties.[23]

At the outset it is clear, notwithstanding defendants' assertions to the contrary, that "Find" is not synonymous with information retrieval services, any more than it is with a series of studies and reports, or with a monthly magazine. Thus, it is not used in its generic sense by either of the parties. Nor is the term, standing alone, descriptive of anything; it fails "forthwith [to] convey [ ] an immediate idea of the ingredients, qualities, or characteristics of the goods."[24] One who telephones Information and is greeted with the salutation, "Good Morning, Find" would not, by hearing these words, be apprised of the nature of plaintiff's business. Nor could a person seeing for the first time the word "Find" on the cover of a magazine, or of a published study or report, accurately determine the publication's contents. In short, the term is not descriptive. On the other hand, "Find" is not a word coined purely for purposes of trademark. It is a common word applied in a manner that is not entirely commonplace, but not quite unfamiliar either.

■ It best fits, then, into the suggestive category. It comprehends a variety of items but does not describe any one of them in particular. The consumer, confronted with the word "Find," who uses "imagination, thought and perception," may conclude that the service so named is information retrieval, or that the product is a publication containing esoteric business information, or a magazine whose goal is to urge subscribers to explore their roots. In each instance there is an imaginative factor connecting the name and the product; the one suggests the other, but without describing it. From the conclusion that "Find" is a suggestive mark, it necessarily follows that it is protected by the trademark laws, and that its registration is valid even without proof of secondary meaning.[25]

■ Registered marks, however, can be rendered generic through public use and thereby forfeit their protection.[26] But the burden is on the junior user challenging a

---

**20.** See Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 n. 12 (2d Cir. 1976).

**21.** Id. at 10.

**22.** Stix Products, Inc. v. United Merchants & Manufacturers Inc., 295 F.Supp. 479, 488 (S.D. N.Y.1968), cited with approval in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 (2d Cir. 1976), and in West & Co., Inc. v. Arica Inst., Inc., 557 F.2d 338, 342 (2d Cir. 1977). See Habitat Design Holdings Ltd. v. Habitat, Inc., 436 F.Supp. 327, 331 n. 5 (S.D.N. Y.1977).

**23.** Of course, the same word may vary in strength depending upon its use. It is the "use of words, not . . . their nature or meaning in the abstract" that is determinative. Venetianaire Corp. of America v. A&P Import Co., 429 F.2d 1079, 1081–82 (2d Cir. 1970) (emphasis in original). See McGregor-Doniger Inc. v.

Drizzle Inc., 599 F.2d 1126, 1131 (2d Cir. 1979); Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976).

**24.** See note 18 supra.

**25.** McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1132 (2d Cir. 1979); American Home Products Corp. v. Johnson Chemical Co., 589 F.2d 103, 106 (2d Cir. 1978); Mushroom Makers, Inc. v. R. G. Barry Corp., 580 F.2d 44, 48 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

**26.** McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1131–32 (2d Cir. 1979); King-Seeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 580 (2d Cir. 1963); cf. Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F.Supp. 479, 483 & n. 11 (S.D.N.Y.1968).

registration to offer evidence to this effect.[27] In the instant case, the defendants failed to carry this burden; they did not offer support for their assertion that plaintiff's marks had suffered this fate. Accordingly, the counterclaim for cancellation of the plaintiff's "Find" is dismissed.[28]

A suggestive mark can be fortified by proof of secondary meaning.[29] In the instant case, Information sought to offer such proof at trial, through five witnesses, customers and competitors of the plaintiff, each of whom testified that Information was known as "Find." That testimony, however, which hardly can be disputed, has only minimal, if any, value with respect to the issues before the Court. Two of the five witnesses had never used any of plaintiff's services at all. Two others had made extensive use of plaintiff's information retrieval services, but were only aware of the existence of its publications through advertisements seen in the newsletter "Findout." None of these witnesses testified that they had purchased or used any of the plaintiff's published studies. Only one witness testified that she had substantial and personal familiarity with these publications. Yet the only one to which she specifically alluded was "Findex," whose mark is not registered by the plaintiff and is, obviously, substantially different from the one at issue here. The testimony of these five witnesses established at most that the name "Find" may have acquired secondary meaning with respect to the information retrieval portion of the plaintiff's business; it had no probative value on the issue of publications called "Find." So, too, the fact that plaintiff's

personnel respond to incoming telephone calls with "Find" does not by itself establish a secondary meaning. In this day of abbreviations and alphabetizing of titles, as commonplace with corporate names as it is with government agencies, the use of such contractions does not establish secondary meaning. More is required—that more has not been established with respect to plaintiff's publications.

**(2) The degree of similarity between the two marks**

After searching scrutiny of all documents and exhibits presented by the parties at trial, the Court concludes that the marks utilized by the plaintiff and the defendants differ substantially in both substance and design. The instances in which the word "Find," used in a non-generic sense, appears alone on a plaintiff-publication, are rare; they occur only in advertisements and publicity brochures. Moreover, the Court is unaware of any instance in which "Find" appears alone on any of the research reports or other brochures offered for sale by the plaintiff. Moreover, when "Find" is used, it is almost invariably coupled with other letters: *e. g.*, "Find/SVP." This is particularly true whenever the plaintiff in any of its printed material uses a designation of origin, such as its business address, for purposes of subscription or inquiry.

Similarly, in nearly all instances in which the defendants have used the word "Find" in the non-generic sense to refer to their product it is coupled with the word "Magazine." The invariable use in its logo is

27. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir. 1979); *West & Co. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir. 1977); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

28. In their counterclaim, the defendants also seek, cancellation of plaintiff's mark "Findout." The validity of that mark, however, was not seriously put at issue here. It is different in substance, meaning, and design from both plaintiff's "Find" and defendants' "Find Magazine." The defendants do not assert any rights in the name "Findout" and have not sought to utilize it at all. They presented no competent or convincing evidence to rebut the presump-

tion of validity accorded to "Findout" by virtue of its registration. Accordingly, this counterclaim is also dismissed.

29. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir. 1979). *Cf. Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 410 (S.D.N.Y.1974). However, the failure to establish secondary meaning does not weaken a more-than-descriptive mark. *Mushroom Makers Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

"Find Magazine." That title is prominently displayed on the magazine itself, on stationery, and on the myriad forms of promotional material distributed by the defendants. In short, this is not a case in which the parties' marks differ only with respect to a single letter;[30] here the entire configuration of letters is substantially different.[31]

Moreover, these differences in wording are emphasized by the distinctions in type design. Each party's mark is always depicted in its own idiosyncratic style. In the plaintiff's "Find," the letters "F" and "I" are square, blocked capitals, linked together and superimposed upon a thick, square-ended arrow. By contrast, all of the letters in defendants' "Find" are in lower case. They have a more fluid appearance than those of the plaintiff; the "f" is rounded at the top, and the entire word is connected at its end to a tapered, baseboard line stretching off to either side. The word "Magazine" appears under the word "find" in smaller, but blocked, upper-case letters. Even a causal inspection of these marks readily reveals their differences:

### (3) The proximity of the products

The parties' products are similar only to the extent that any material that is printed and distributed is a publication; in all other respects, they differ. The differences between plaintiff's information retrieval service and defendants' magazine are obvious. The relevant comparison in this case, however, is between plaintiff's publications and defendants' Find Magazine. Here, too, the differences are substantial. These items are not in competition with each other.

Plaintiff's publications are specialty items, dealing with the minutiae of small, particularized areas of business or of industrial segments of the economy. They are sold to businessmen at their business addresses for use in business endeavors. With the exception of the newsletter "Findout," which serves a largely promotional function, and the booklet "Findex," which is periodically updated, plaintiff's publications are single, unserialized items complete in themselves, sold on a one-time basis and for the most part at very high prices. It is unlikely that many of them would be purchased for anything other than business-related purposes.

The defendants' magazine has a wholly different cast. It is intended for the family, not the specialist; it covers broad topics in general terms, rather than narrow ones in depth. It is sold to individuals, not companies; is read for pleasure, not business; is mailed to the home, not the workplace. It is a periodical, published at regular intervals and sold on a subscription basis. It is priced to be competitive with other magazines at newsstands, rather than with library treatises.[32]

After considering the topics covered by the parties' respective publications, their prices, methods of distribution, and intended and actual readerships, the Court concludes that they appeal to different customers, are sold in entirely different markets, exist for distinct purposes, and thus, are in no sense proximate products.

### (4) Bridging the gap

The concept of "bridging the gap" considers the senior user's interest in preserving reasonable avenues of future expansion into related fields.[33] However,

**30.** *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47–48 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

**31.** *Cf. B & L Sales Assoc. v. H. Daroff & Sons, Inc.*, 421 F.2d 352 (2d Cir.), *cert. denied*, 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970) (no likelihood of confusion where defendant used plaintiff's trademark accompanied by its own slogan); *Continental Corrugated Contain-*

*er v. Continental Group*, 462 F.Supp. 200, 205 (S.D.N.Y.1978).

**32.** Although not dispositive in itself, difference in price between the products is one more factor to be considered in assessing product proximity and the likelihood of confusion. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 n.5 (2d Cir. 1979).

**33.** *See* note 13 *supra* & accompanying text. *See also Mushroom Makers, Inc. v. R. G. Barry*

there is a countervailing public interest in not providing an overly broad ambit of protection that would enable the senior user to preclude others from entering unrelated markets into which it has no intention of entering.[34] That plaintiff has registered "Find" for an information retrieval service does not by itself grant it a preemptive right to the mark for unrelated and non-competitive services or products. Plaintiff, however, argues that the defendants' magazine intrudes upon an area into which it has already expanded and might reasonably be expected to expand further. The defendants counter by dismissing Information's publications as so insignificant in circulation and impact that their existence is not even acknowledged by the recognized directories that list all publications in print. Neither argument hits the mark.

Applying the term publication in its broadest sense, it may be accepted that plaintiff is in the publications field, and that this aspect of its business is expanding. An increasing portion of its revenue is generated through the sale of its publications. However, this operation is still ancillary to its main service of information retrieval and customized research instigated by customer request, which plaintiff itself has characterized as the "backbone" of its business. Its publications clearly are not magazines. Plaintiff is not a "publisher" in the traditional sense; it does not consider itself to be such or list itself in that fashion in the telephone directory. Plaintiff's publications are oriented principally to the corporate community and its output is confined to single subjects usually of an economic nature. They are far removed from a monthly or quarterly magazine directed to a selected group. Although its business is expanding, there is no evidence that plaintiff contemplates or plans to undertake the production, publication, and distribution of a periodical magazine containing general, family-oriented information of the type published by the defendants. There is no evidence that plaintiff can, will, or intends to "bridge the gap" between the publications it now offers for sale and those offered by the defendants.

### (5) Actual confusion

It is recognized that a plaintiff usually faces a formidable task in obtaining proof of actual confusion as to the source of products.[35] In this instance, plaintiff's task was made no easier in that at the time of trial only a single issue of Find Magazine had been distributed. Nonetheless, reasonable opportunity existed to obtain supporting evidence. More than two months prior to the magazine's distribution there had been advance publicity through radio commercials and newspaper advertising of which plaintiff was aware sufficiently in advance of trial. Moreover, defendants' first issue reached 131,000 households in two geographically concentrated areas.

As has already been mentioned, four of plaintiff's five witnesses, called to testify on the issue of actual confusion, had no contact with any of plaintiff's publications other than "Findout." The fifth, who claimed substantial familiarity with plaintiff's publications, in fact testified only with respect to Findex, and made no mention of the studies and reports at issue here. Indeed, not a single witness testified to having received or read any of Information's

*Corp.*, 580 F.2d 44, 49 (2d Cir. 1978), *aff'g*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977); *Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607, 613 (2d Cir.), *cert. denied*, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); *Puritan Sportswear Corp. v. Puritan Fashions Corp.*, 232 F.Supp. 550 (S.D.N.Y.1964). *Cf. American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir. 1979).

**34.** *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97–98, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918); *American Footwear Corp. v. Gen-*

*eral Footwear Co.*, 609 F.2d 655, 663–64 (2d Cir. 1979).

**35.** *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1231 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44, 48 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). On the other hand, even a survey prepared in anticipation of litigation could have been probative. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979).

published studies or reports. And even the witness who purchased Findex did so only on behalf of her clients, rather than for her own use.

The testimony of these witnesses with respect to defendants' magazine was of the same character. One witness, who had never even skimmed plaintiff's publications, was handed a copy of defendants' magazine on the morning of trial and asked to render an opinion on whether confusion over its origin was likely. The other four first saw copies of Find Magazine one or two days before trial apparently in preparation for their trial testimony. None of these witnesses testified· to having received their copies through the normal channels of·distribution. None had ever seen Find Magazine's advertisements or heard its commercials in the months before trial. Although they expressed a gamut of emotions including shock and dismay upon seeing the defendants' magazine for the first time, their testimony was attuned to support plaintiff's pejorative view of defendants' magazine and in suppport of plaintiff's dilution claim. One of these witnesses who saw the defendants' magazine two days before trial and was "dismayed" by it, further testified that she attributed it to the plaintiff. In view of her broad experience as a "library development consultant" who deemed herself a "colleague" of plaintiff in the "information industry," her clearly result-oriented testimony must be viewed with skepticism.[36]

██ Plaintiff's telephone operator testified that she had received a few misdirected calls; none were received by the defendants. There was no instance of misdirected mail either to plaintiff or defendants. The testimony of these few isolated instances of claimed confusion is not sufficient to sustain the burden of proof on the issue.[37]

██ Not a single person to whom defendants' magazine was distributed or who was exposed to its promotion and advertising campaigns in the more than two months prior to its distribution was called to testify with respect to the confusion issue. It is also significant that plaintiff, though possessed of the financial means, did not undertake a survey of public consumer reaction to the products under actual market conditions.[38] There was ample time to conduct, in the limited consumer markets in which both products are distributed, a telephone or other appropriate survey to obtain consumer reaction. Plaintiff knew by February 1, 1980 that Find Magazine was to be published, with the first issue available on March 20, 1980. Plaintiff stresses with some boastful pride its list of customers who avail themselves of its retrieval services or purchase its publications. These include Newsweek, Mobil, IBM, United Jewish Appeal, Bank of Tokyo, to mention but a few.[39] Such customers interested in obtaining information relating to a business, industry, government, a product or economic matters, are not likely to be confused as to the origin of Find Magazine whose dominant appeal is to an ethnic non-business group residing in the Long Island area and in the Greater Delaware Valley. The absence of testimony from such customers invites an adverse inference.[40]

36. One other witness who saw the magazine one day before the trial testified to "confusion" without defining the nature of the confusion. She also testified that she had never used any of plaintiff's services.

37. See Continental Corrugated Container v. Continental Group, 462 F.Supp. 200, 203, 205 (S.D.N.Y.1978). Cf. Mushroom Makers, Inc. v. R. G. Barry Corp., 441 F.Supp. 1220, 1232 (S.D. N.Y.1977), aff'd, 580 F.2d 44 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); Puritan Sportswear Corp. v. Puritan Fashions Corp., 232 F.Supp. 550, 554 (S.D.N.Y.1964).

38. Mushroom Makers, Inc. v. R. G. Barry Corp., 441 F.Supp. 1220, 1231 & n. 44 (S.D.N.Y. 1977), aff'd, 580 F.2d 44 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Cf. McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1136 (2d Cir. 1979) (citing cases) (while plaintiff need not prove actual confusion in order to prevail, trial court may properly draw adverse inference from failure to proffer such proof.)

39. Plaintiff's Exh. 3.

40. See note 38 supra.

As to plaintiff's claim of confusion based upon its position that information retrieval services and magazines are jointly owned by a single entity using the same mark, citing *The New York Times* and *Time Magazine* as examples, the proof does not establish that in fact it is a common industry practice or that confusion resulted.

The defendants called two witnesses, one Find Magazine's circulation consultant and the other its advertising sales representative, who offered their opinions that there was no likelihood of confusion. Their testimony appeared as result-oriented as that of plaintiff's witnesses on this subject. Indeed, the characterization of these witnesses' testimony by plaintiff's counsel as "self-serving, uninformed . . . [and] entitled to no weight" may well be applied to all opinion testimony on this particular subject.

In sum, the plaintiff has failed to offer convincing evidence to support its contention of actual confusion. However, this by itself is not determinative of the ultimate issue.

### (6) The defendants' good faith

It is not contended that "Find Magazine" was chosen as a result of plaintiff's success; nor is it contended that the defendants have sought to trade on plaintiff's reputation, or to obtain a "free ride" at plaintiff's expense.[41] However, plaintiff does charge defendants with bad faith since they selected "Find Magazine" when they knew that In-

formation had already registered that name for its retrieval service; it further charges that the defendants' conduct was compounded by its persistence in adhering to that name even after plaintiff asserted its claimed rights to the name, and its intention to sue to enforce those rights.

█ The evidence establishes, however, that the defendants' choice of their magazine's name was motivated solely by legitimate business concerns: the belief that a monosyllabic title (such as *Time, Life* or *Look*) would make an impression on the public mind and thereby enhance sales, and the desire to choose a name that suggested the introspective qualities attributed to the magazine's putative readership. Before finally settling upon that name, the defendants sought and obtained the advice of specially retained patent counsel. Knowledge of the existence of plaintiff's trademark, by itself, does not establish that defendants acted in bad faith. Plaintiff's mark "Find" is registered solely for use in "providing computerized information retrieval services on a subscription basis." Indeed, patent counsel's determination that the name "Find Magazine" could be used without infringing upon plaintiff's rights was based in part upon the fact that the patent office which initially had rejected plaintiff's application to register "Find" for "information retrieval services," thereafter issued the registration in reliance upon plaintiff's sworn statement that it was not engaged in the publishing business.[42] In its decision to adopt the name, and in each subsequent

---

**41.** *See Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1229, 1230 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (*quoting Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 199 (2d Cir. 1962)).

**42.** Plaintiff's first application to register the name "Find" was rejected by the patent examiner because plaintiff's use of the mark was deemed likely to cause confusion with a then subsisting mark "Find," owned by a company called National Design Center, and registered for a "Magazine providing a reference source for and guide to products, research reports and book, film and service guides. . . . "

Thereafter, plaintiff reapplied for its registration by listing its current designation for its services; its second application contained the sworn statement of plaintiff's chairman, Mr. Garvin, that "no other person, firm, corporation or association has the right to use" the same mark for similar goods or services. This application was approved.

The obvious implication of this statement is that there was no likelihood of confusion between the use of plaintiff's mark "Find" for "information retrieval services" and the use of the mark "Find" for magazines published as described by National Design Center.

After plaintiff's application had been approved, the National Design Center's mark was cancelled. Plaintiff's designation of the service it provides has remained unchanged.

proceeding, the defendants relied upon the advice of counsel. And even if counsel's judgment were wrong, this would not be sufficient to tax the defendant with that "'species of bad faith which constitutes independent and substantive proof of infringement.'"[43] In sum, the Court finds that defendants' adoption of "Find Magazine" was made in good faith.

*(7) The quality of the defendants' product*

■ Here the nub of plaintiff's position is that it enjoys a public reputation as a supplier of unbiased, nonpartisan information and that public identification of it with a magazine reflecting private interest attitudes emphasizing ethnic concerns will destroy its credibility as a source of reliable and objective information. Based thereon and adopting a somewhat elitist attitude, the plaintiff portrays Find Magazine as biased, of inferior quality, sensationalistic, and doomed to failure. Plaintiff's denigration of the quality of defendants' magazine does not accord with the facts. The magazine on the whole has a pleasing appearance, with an attractive layout and graphics design, and glossy paper replete with color photographs, suitably interspersed with advertisements by both national and local companies. The articles are by nationally prominent writers. As already noted, the editor, Ms. Sheila Jacobson, who has direct supervision over the magazine's contents, is an experienced journalist who recently received a recognized and coveted industry award. She testified that Find Magazine rigidly followed a policy of double-checking every factual assertion contained in an article before printing it. Although plaintiff and its witnesses attacked the headlines on the cover of Find Magazine as flamboyant and sensationalistic—an exaggerated charge—they did not in any way challenge the veracity of the magazine's stories or features. In short, none of the evidence undermines our conclusion that the magazine is what it purports to be: a modestly priced publication containing a broad scope of carefully edited articles written by prominent authors and dealing with issues of interest to a particular segment of the Jewish community. The claims of dilution and tarnishment are without support.[44]

*(8) The sophistication of the buyers*

■ Both parties tout the sophistication of their customers. When transacting business with the corporations, libraries and universities subscribing to its services, In-

---

**43.** *See* note 41 *supra.*

**44.** In pressing its claim of dilution, plaintiff relies principally upon a passage in *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544–45, 399 N.Y. S.2d 628, 632, 369 N.E.2d 1162 (1977), in which the New York Court of Appeals stated that it was not necessary to demonstrate confusion between marks in order to prevail upon a claim under the state anti-dilution statute. Our own Court of Appeals has observed that this remark is dictum, and is "contrary to the weight of state and federal authority . . . ." *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 580 F.2d 44, 49 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). *See Exquisite Form Indus., Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 414–15 (S.D.N.Y. 1974). *But see Dallas Cowboys v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 n. 8 (2d Cir. 1979). Even those cases which hold that a showing of confusion is unnecessary to support a claim of dilution require proof that the alleged diluter has "selected its mark with the express intent of trading on plaintiff's reputation." *Exquisite Form, supra,* 378 F.Supp. at 415 (citing cases). Here there is no such contention. Moreover, the language of the statute itself requires a showing of "[l]ikelihood of injury to [plaintiff's] business reputation or of dilution of the distinctive quality of [its] mark or trade name." The evidence does not support a finding that defendants' magazine, which is sold in a market totally removed from that of the plaintiff, caused such injury or is likely to do so in the future.

Tarnishment is a species of dilution, which itself is part of the broader category of unfair competition. *See* 3 Callmann, Unfair Competition, Trademarks, and Monopolies §§ 84.2 at 955–58 & n. 60; 84.2(a), at 976–78 (3d ed. 1969). An essential element of such a claim is proof of "unfair intent," of direct competition between the parties' respective products, or of the inferior quality of defendants' product. *See G. B. Kent & Sons, Ltd. v. P. Lorillard Co.,* 114 F.Supp. 621, 630 (S.D.N.Y.1953), *aff'd per curiam,* 210 F.2d 953 (2d Cir. 1954). *Cf. Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir. 1959). None of these elements has been established.

formation deals almost exclusively with management personnel, business executives, professionals and consultants. Not surprisingly, most of its own employees have college degrees, as do most of the defendants'. According to its prospectus, Find Magazine seeks to attract subscriptions from "discriminating people . . . with an appetite for the good life and who want to read the work of outstanding writers"; [45] included in that group are "high income professionals and business executives," with "lively minds . . . wide interests, [and] diverse viewpoints."

If these assertions by the litigants are credited, it would be difficult to imagine consumers more discerning than these and less susceptible to the vagaries of a name. This is particularly true of plaintiff's customers, who seek out Information's services and publications only when they have formulated particular requests, or after they have identified their own information needs. Although one witness, an advertising executive, indeed did testify that he was so shocked by the advent of Find Magazine and its possible links with plaintiff's organization that he considered discontinuing his use of Information's services, the Court discounts this testimony as hyperbole offered to sustain plaintiff's elitist attitude. It taxes credulity beyond belief that an experienced advertising executive who relied "quite heavily" on Information, and who claimed that plaintiff's service was "practically the only one that people [in the advertising field] quote and use," would so lightly discard it in favor of a competitor, particularly when the witness "ha[d] never heard of any other organization" providing a similar service.

Neither party offers the kind of product purchased upon impulse.[46] Neither appeals to a clientele of impulse purchasers. Both parties are supported by an educated, discerning, and sophisticated clientele not easily misled or confused.

*Conclusion*

■ The preponderance of the factors points only in one direction; the plaintiff has not carried its burden of proof on the ultimate issues. The disparity in the products is particularly noteworthy. Plaintiff's forays into the publication field have been undertaken solely as an adjunct to and in furtherance of its underlying venture as an information retrieval service specializing in the provision of technical business information for corporate use. There is no evidence that plaintiff has made any effort to expand into the defendants' market, the magazine field, or even contemplated such an expansion. To accord plaintiff a protectible interest in the name "Find," used alone or in conjunction with other words, as applied to any other disparate and untapped area of the publications field, would be tantamount to awarding it exclusive dominion over the use of the word, and the right to impair other parties' entries into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose. As the Supreme Court stated many years ago:

> There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

. . . . .

---

45. Defendants' Exh. 10.

46. *Compare Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379, 381 (2d Cir. 1970) ("reasonably careful shoppers" likely to confuse two brands of coffee, each bearing the mark "Hills," placed next to each other on supermarket shelf). The more expensive a product is, the more careful a typical consumer will be in ascertaining its origin before purchasing it. *See McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir. 1979) (citing cases).

**164**

The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly.[47]

Although time has loosened the strictures of that rule to permit the trademark holder a reasonable right of expansion into closely related areas,[48] there is no corollary right to preclusive use of the mark against non-competitors operating in markets far removed from those of the trademark holder. In the case at bar plaintiff has failed to show the proximity of its and the defendants' products; that its mark is sufficiently similar to that of the defendants to engender confusion, or that it has in fact engendered such confusion under actual market conditions; or that a substantial number of ordinarily prudent purchasers are likely to be misled or confused as to the source of the parties' respective products.[49] In sum, there is no rational basis upon which to support a claim of likelihood of confusion, unfair competition, dilution, or tarnishment.

Accordingly, judgment may be entered in favor of the defendants on all claims; and on the counterclaims, in favor of the plaintiff.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

**47.** *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97–98, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918). *See American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir. 1979).

**48.** *See, e. g., Mushroom Makers, Inc. v. R. G. Barry Corp.,* 580 F.2d 44, 49 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 613 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d

224 (1960); *Puritan Sportswear Corp. v. Puritan Fashions Corp.,* 232 F.Supp. 550, 554 (S.D. N.Y.1964).

**49.** *See Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220, 1232 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir. 1956).