**LOBO ENTERPRISES, INC. trading as Tunnel Bar, a/k/a the Tunnel Plaintiff,**

v.

**The TUNNEL, INC., Defendant.**

**No. 86 Civ. 9754 (MBM).**

United States District Court, S.D. New York.

Aug. 29, 1988.

Jane Shay Wald, Gottlieb, Rackman & Reisman, P.C., New York City, for plaintiff.

Oliver P. Howes, Jr., Nims, Howes, Collision & Isner, New York City, for defendant.

MUKASEY, District Judge.

Plaintiff Lobo Enterprises, Inc. operates a small bar at 7th Street and First Avenue in Manhattan, called "Tunnel Bar," that caters primarily if not exclusively to gay men. It seeks to enjoin[1] defendant Tunnel, Inc. under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), from using "Tunnel" as the name of defendant's nightclub and discotheque at 27th Street and Twelfth Avenue, also in Manhattan; defendant devotes one night per week to gay clientele. Judge Kevin T. Duffy denied a preliminary injunction initially on grounds of (i) lack of subject matter jurisdiction for failure to demonstrate effect on interstate commerce, and (ii) a finding that plaintiff's "Tunnel Bar" catered only to "a distinct subset of the gay population interested in 'leather.' "

652 F.Supp. 1037, 1044 n. 2 (S.D.N.Y.1987). The Court of Appeals reversed the jurisdictional determination and found also that the record would not support a conclusion that plaintiff's bar attracted only those "interested in 'leather.' " 822 F.2d 331, 334 (2d Cir.1987). However, neither was the record "so compelling as to indicate that the plaintiff must be granted a preliminary injunction," id., and the case was remanded for further proceedings.

Following transfer of the case to my docket, the preliminary injunction hearing was combined with the trial on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P., by agreement of the parties, and the matter was heard on April 5 and April 15, 1988. After a review of the evidence at trial, including the exhibits and the testimony and demeanor of the witnesses, and an examination of the post-trial submissions of the parties, I conclude for the reasons set forth below that plaintiff has failed to prove "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source" of the recreation offered at the two establishments. *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Therefore, the injunction is denied and the complaint dismissed.

## I.

Decisions in Lanham Act cases usually are highly fact-specific because such decisions require a "comprehensive analysis of all the relevant facts and circumstances," *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981), *i.e.*, "all factors bearing on the likelihood of confusion," as well as "balancing the conflicting interests of the parties involved." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132, 1140 (2d Cir.1979). *See also, Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 214 (2d Cir.1985) ("[E]ach trademark infringement case presents its own unique

---

**1.** Plaintiff seeks only an injunction; it has waived any right to monetary damages based upon alleged loss of patronage.

set of facts.") Accordingly, although many of the facts relating to the parties' businesses were established at the preliminary injunction hearing and were set forth in the Second Circuit's earlier opinion in this case, 822 F.2d at 331–32, it is nonetheless useful to repeat them here, along with additional information developed at the trial before me.

### A. *Plaintiff's Business*

Plaintiff's bar opened in August 1984. Catering primarily to gay men, the "Tunnel Bar" occupies an $18 \times 70$ foot space that includes a 40–foot bar, and has a capacity of 125 patrons. Plaintiff's "Tunnel Bar" charges from $2.50 to $4.25 for hard liquor drinks and sells beer for $1 per glass; it charges no admission fee. Prel. Inj. Tr. 67–68 It has no cabaret license, and therefore no dance floor, Prel. Inj. Tr. 73, although its ambience includes taped music. Prel. Inj. Tr. 17 The "Tunnel Bar" logo appears on the steel shutter that covers the front of the building it occupies: a crossed spade and pickaxe superimposed on a gear wheel.

Although plaintiff's bar is listed in a variety of gay entertainment guides as featuring a "Levi and leather" or "Levi" or "cowboy" atmosphere, the evidence at trial does not support the conclusion that plaintiff caters exclusively or even primarily to any particular segment of the gay community so defined,[2] although as set forth below its atmosphere and appeal in other respects distinguish it in significant ways from defendant's establishment. According to its manager, plaintiff's bar offers parties both monthly and in more or less impromptu fashion around various events (*e.g.*, birthdays) and themes (*e.g.*, "Margarita Madness," featuring discount drinks) so as to promote a club atmosphere (Prel. Inj. Tr. 40; Trial Tr. 93); one night a week it also offers erotic movies of interest to homosexual men. Pl. Ex. 89

Plaintiff Lobo has advertised the "Tunnel Bar" with name, location and telephone number in several gay-oriented publications that circulate in the tri-state metropolitan area of New York, but has never listed the "Tunnel Bar" in the New York Telephone NYNEX white pages. Plaintiff's manager explained at trial that plaintiff preferred not to list the name of the "Tunnel Bar" in a directory of general circulation so as to avoid harassing telephone calls and to make it more difficult for employees to receive personal telephone calls. Trial Tr. 39 Lobo did not file a Certificate of Conducting Business under an Assumed Name as required by N.Y. Gen. Bus. L. § 130(1) (McKinney 1988) until after it started this lawsuit.

### B. *Defendant's Business*

Defendant The Tunnel, Inc. began in the spring of 1986 to renovate at a cost of about $3 million a previously unused train tunnel at 27th Street and 12th Avenue. The renovations included installing a 2,000–square-foot dance floor and state-of-the-art sound and computerized lighting equipment that converted the 740–foot-long tunnel into a night club and discotheque. A trademark search indicated that the proposed name, "Tunnel," was available and defendant has operated under that name at least since January 1987 when plaintiff's application for a preliminary injunction was denied.

Defendant's "Tunnel" can accommodate more than 2,000 patrons in its main room and an additional 400 in its basement. Defendant cultivates an image of glamor, and seeks to attract both those whose names appear on the entertainment and society pages, and those drawn by the presence of such people. Admission is by invitation and/or payment of an entrance fee that can run as high as $20 on weekends; liquor at one of the three bars in defendant's "Tunnel" costs between $5 and $8 a drink, beer about $4.50. Prel. Inj. Tr. 186–87 Apart

---

**2.** The evidence at trial confirms the Court of Appeals' conclusion that such terms as "leather" suggest varying images of roughness. 822 F.2d at 333 n. 1. According to one witness, bars range from "Lacoste," apparently a reference to

the well known sportswear manufacturer, at the gentle end of the spectrum, through "Levi" or "cowboy," and "leather," to "motorcycle" at the rough end. Trial Tr. 30–33.

from the natural selection such tariffs may effect, defendant stations an employee at the door to assure that only patrons defendant wishes to attract are admitted. Both live music and recorded music played by disc jockeys are featured, and activity is centered on the dance floor. Defendant does not advertise, but does energetically promote coverage in that segment of the press that covers the activities of those whose patronage defendant seeks to attract.

Defendant caters almost exclusively to a gay clientele one night a week—Sunday, which is a "gay night" at many New York City discotheques. Although defendant at one time attempted to attract gay customers on Thursday nights as well, that effort was unsuccessful. According to the testimony at trial, this failure came about because Thursday night was not exclusively or even primarily a "gay night" at defendant's "Tunnel" and gay customers felt uncomfortable in a "mixed" setting. Trial Tr. 154 Defendant has contracted with Steven Cohn, a major and recognized promoter of gay events, to run its Sunday night functions. Cohn maintains various categories of mailing lists, including one for gay events, and regularly sends out about 15,-000 invitations to the Sunday night functions at defendant's "Tunnel." Cohn describes those he seeks to attract to the Sunday night functions as "upscale" and interested in attending these functions primarily to dance. Plaintiff expended substantial energy introducing evidence that several of these functions have been billed as tributes to or otherwise connected with erotic magazines targeted at homosexual males, which magazines allegedly were available to patrons, as were films of similar tenor.

Defendant's logo consists of two parallel lines above an inverted "U," apparently representing the entrance to a tunnel; this logo is used on some but by no means all of Cohn's invitations to the Sunday night events.

One guide to gay entertainment was introduced in evidence that regularly lists both plaintiff's "Tunnel Bar" and defendant's "Tunnel," the former under the general heading of the "Bar Guide" and the latter under the sub-heading "Disco's." *See, e.g.*, Pl. Ex. 52–53.

## C. *Evidence of Confusion*

The only proof of actual confusion offered by plaintiff consisted of the following discrete items of evidence: First, plaintiff introduced a letter received by plaintiff's "Tunnel Bar" from a correspondent who identified himself as a male model and actor, and asked to receive information about membership cards and to be included on the mailing list. From the suggestion of the author's personal attractiveness and his reference to membership cards, plaintiff asks me to conclude that this correspondent is referring to defendant's "Tunnel," which allegedly maintains a restrictive admissions policy to which such allusions would relate. Trial Tr. 56–57

Further, Robert Ader, the manager of plaintiff's "Tunnel Bar," testified that he would frequently overhear statements of passersby, whom he took for the most part to be tourists, that plaintiff's bar was the place they had read about or, if the overheard conversation occurred by day, that they had not realized that "the Tunnel" was open during the day, and other statements of similar import. Ader, himself a lawyer, testified that many of these hearsay declarations were overheard after the commencement of this litigation, but he did not note the dates or attempt to find out the identity of any of the declarants. From Ader's description of these declarants, it does not appear that any of them was a potential customer of plaintiff's "Tunnel Bar." Trial Tr. 78–81; 92–93

Ader testified to one specific instance on the immediately preceding New Year's Eve when a white stretch limousine "with 76 wheels" pulled up outside plaintiff's bar "and this mixed crowd [of men and women] got out." The men were "wearing white dinner jackets. Who is going to wear a white dinner jacket then? I figured they were from—well, provincial." Once inside, "everybody flushed with giggles. On New Year's Eve we were showing our male erot-

ic videos. There was much embarrassment...." Apparently, "their driver had taken them to the right [plaintiff's] Tunnel instead of the wrong [defendant's] Tunnel and they left." Trial Tr. 81–82

A former bartender at plaintiff's "Tunnel Bar" testified that he received calls at the bar, most frequently on Sunday afternoons, inquiring about the price of admission, when the dance floor opened, whether jeans were acceptable, and other questions that arguably reflected the callers' belief that they were calling defendant's "Tunnel." These calls were most frequent at the end of December 1987 and the beginning of January 1988, and diminished thereafter. Again, although the bartender told Ader about the calls, he was never told to keep any record of them or to try to determine the identity of the callers and the source of their confusion, if such it was. The same bartender testified also to having told third parties he worked at the "Tunnel," and later being told by them that they had looked for him without success at defendant's establishment. Once more, the identity of these declarants was not disclosed nor was any attempt made to secure their testimony. Trial Tr. 211–16

Finally, one witness called by plaintiff to illustrate actual confusion testified that he serves as a volunteer at a telephone information service catering to the gay community and that plaintiff's "Tunnel Bar" is listed at that service as a bar while defendant's "Tunnel" is listed as a discotheque. The plain thrust of that testimony was that he had no confusion whatever about the two establishments. Trial Tr. 194–206

Notably, although Ader has visited defendant's "Tunnel" twice and recognized there patrons of plaintiff's "Tunnel Bar," neither he nor anyone else made any attempt to determine whether those patrons were confused or thought the two businesses were under common management or ownership. Trial Tr. 93–95 Neither did plaintiff offer any evidence of surveys or canvasses of actual or potential customers of plaintiff's "Tunnel Bar" as to their actual or potential confusion about the source of the recreation offered at the two establishments.

## II.

Plaintiff argues that the above facts present "a classic reverse confusion case," Pl. Post–Trial Br. 1, and indeed that I need consult "only *one* case" in order to decide it. *Id.* (emphasis in original) That case is *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486 (2d Cir.1988), in which the Court of Appeals explicitly recognized a reverse confusion claim "when the junior user—because it is bigger and better known in the marketplace—is wrongly viewed as the source of the goods in question." *Id.* at 487. Although I go as far with plaintiff as to accept that *Banff* would provide support if the facts here justified a finding of reverse confusion, plaintiff's reliance on that case is otherwise misplaced and its view of the reverse confusion doctrine overly broad.

■ Whether a court deals with reverse confusion, or with the sort more routinely encountered involving a junior user's arguable attempt to trade on the better known name of a senior user, the determination under Section 43(a) of the Lanham Act of whether an unregistered mark has been infringed is a two-step process. First, a plaintiff must show that its mark is strong enough to warrant protection under the test articulated in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). Second, plaintiff must show "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods [or services] in question," *Mushroom Makers, Inc. v. R.G. Barry Corp., supra,* 580 F.2d at 47, applying a multi-factor test that includes but is not necessarily limited to the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Banff, supra,* 841 F.2d at 489–90.

### A. *Strength of the Mark*

■ Strength of a mark is defined for these purposes as the tendency of the mark to identify what is sold under the mark "as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc., supra,* 599 F.2d at 1131. The four recognized categories of strength, in ascending order, are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch Co., supra,* 537 F.2d at 9. The last category, the one deemed strongest and thus most deserving of protection, includes words invented solely for use as trademarks ("fanciful") and ordinary words used in an unfamiliar way ("arbitrary"). *Id.* at 11 n. 12. Plaintiff's mark, as applied to its own business, would appear to be an ordinary word—Tunnel—used in an unfamiliar way —as the name of a bar, and thus is an arbitrary mark. Because such a mark is deserving of protection, I must now determine whether plaintiff has shown likelihood of confusion.

### B. *Likelihood of Confusion*

■ *Polaroid*'s multi-factor test of whether a senior user has shown likelihood of confusion deserving of injunctive relief is as follows:

> strength of [the senior user's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid, supra,* 287 F.2d at 495.

1. *Strength of the Mark*—Here I have already determined that the mark in question is a strong one deserving of protection.

2. *Degree of Similarity Between the Marks*—This factor as well weighs in plaintiff's favor because the marks are nearly identical. Although the correct name of plaintiff's establishment is "Tunnel Bar" whereas defendant's place of business is known simply as "The Tunnel" or "Tunnel," the operative word in both cases is "Tunnel." To be sure, plaintiff's logo—a crossed spade and pick-axe superimposed on a gear wheel, differs substantially from defendant's—two parallel lines above an inverted "U" suggesting the entrance to a tunnel. However, the listings in entertainment guides for plaintiff's bar rarely if ever use plaintiff's logo, although plaintiff's advertising does use it; the Cohn mailings frequently do not use defendant's logo; the media reports do not use any logo; and whatever accounts of either establishment may be spread by word of mouth cannot perforce use any logo. Again, the operative word, and thus the operative part of the mark, is "Tunnel."

3. *Proximity of the Products*—It is here that the *Polaroid* factors and plaintiff's interest begin to diverge. As plaintiff emphasizes, there are indeed similarities between plaintiff's "Tunnel Bar" and defendant's "Tunnel." Both are places of recreation; both serve alcoholic beverages; at least one night a week both appeal primarily if not exclusively to homosexual men; both offer entertainment of one sort or another, which may include erotic movies of interest to gay men. But this overlooks the substantial difference in what is offered to the patrons at each, and what the patrons actually do at each. The patrons in defendant's "Tunnel" on Sunday nights attend large events organized around dancing, an activity that is not available at plaintiff's "Tunnel Bar," which has no cabaret license and no dance floor. According to the testimony of Cohn, which I credit, people do not attend these events simply to stand around and drink, however much they may enjoy good fellowship while so doing. Rather, it is apparent that defendant's establishment attracts patrons who wish to attend a large night club to enjoy and participate in the ambience that it offers, centered around the dance floor and enhanced, if that is the word, by the high-tech lighting and sound systems, and live music or disc jockeys referred to above, none of which is available at the "Tunnel Bar," a neighborhood bar that holds a maximum of 125 patrons. Despite plaintiff's strong and intermittently shrill

emphasis on the erotic movies occasionally shown on Sunday nights at defendant's "Tunnel" (a genre at least equally available at plaintiff's "Tunnel Bar"), the evidence simply will not support the conclusion that such material is a major factor in attracting patrons. In addition to the nature of what is offered to patrons of these two businesses, an assessment of product proximity requires an evaluation also of the structure of the relevant market, a factor "analogous" to the factor of purchaser sophistication. *Vitarroz, supra,* 644 F.2d at 967. Here, although I have found that plaintiff's "Tunnel Bar" is not limited in its appeal to homosexual males affecting a "leather" appearance, *see* p. 73, *supra,* neither is its appeal coextensive with that of defendant's "Tunnel," which draws its patrons by invitation and/or upon payment of an entrance fee and uses its image and admissions policy to seek out an "upscale" group who may regard its ambience as glamorous and are willing to pay the higher costs that go with such surroundings.

4. *Likelihood Plaintiff Will Bridge the Gap*—Here the question to be considered is whether there is any evidence that plaintiff will expand or change its business so as to make it similar or identical to defendant's. There is no such evidence.

5. *Actual Confusion*—With respect to this element of confusion, it is important to keep in mind that what we are dealing with under *Polaroid* is confusion as to source, and that the only relevant population is potential purchasers. With those considerations in mind, it is apparent that plaintiff has presented virtually no evidence of actual confusion; indeed, if one considers also the "reverse confusion" theory on which plaintiff tried this case, the qualifier "virtually" can be dispensed with because proof of such confusion would require evidence that some potential patron of the "Tunnel Bar" believed that defendant's "Tunnel" in fact was the senior user of the mark and that plaintiff was "an unauthorized infringer," *Banff, supra,* 841 F.2d at 490, which could injure plaintiff's reputation. *Id.* There was absolutely no evidence of that kind.

Taking the items of proof presented by plaintiff in the order discussed above, only sheer speculation would permit me to conclude that the inquiries from plaintiff's correspondent about a mailing list, which plaintiff in fact has, and a membership card, which there was no evidence either party had employed, resulted from his belief that plaintiff's bar was in fact defendant's discotheque. Nor is there anything to indicate that any of the unidentified passersby who apparently thought they were in front of defendant's place of business were potential patrons of plaintiff's bar. To the contrary, the testimony was to the effect that they either passed by or looked in and then continued on their way—convincing proof that they were not interested for whatever reason in patronizing plaintiff's establishment. The same holds true with greater force for the limousine-load of "provincial" New Years Eve revelers in white dinner jackets who quickly left as soon as their driver's error became apparent. Again, it was the driver's mistake and not theirs, and they were plainly not potential customers of plaintiff. With respect to the unidentified telephone callers to plaintiff's bar on Sunday afternoons whose inquiries about dancing, the price of admission and attire apparently reflected their belief that they had called defendant's "Tunnel," there is again no evidence that they were potential patrons of plaintiff's "Tunnel Bar." If anything, their inquiries about activities and subjects that had no relevance to plaintiff's bar suggests strongly that they were not. Finally, the testimony of plaintiff's former bartender as to what third parties told him about their efforts to find him at defendant's "Tunnel," offered for the truth of such statements, may not be considered for any purpose even if I found in such testimony evidence of reverse confusion, which I do not. Rule 802, Fed.R.Evid.

Contrasting strongly with the poverty of proof showing actual confusion is the wealth of speculation plaintiff has proffered about out of town visitors who may have heard favorable reports about plaintiff's bar and who then visit defendant's discotheque instead. If they do so on a

Sunday night, plaintiff speculates, they may have a good time and never visit plaintiff's bar; if they do so on some other night, they may feel uncomfortable and return to their home towns with an unfavorable impression which they may share with their friends, thereby aggravating the damage. Plaintiff offers such speculation with the repeated reminder that what must be proved in the final analysis is not actual confusion but merely likelihood of confusion. That is true, particularly when little time has elapsed from the time the alleged infringement has begun until the time the issue is heard and there has not been sufficient opportunity to gather such evidence. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987). However, in this case, plaintiff had some 15 months in which to gather evidence of actual confusion. Opportunities abounded to canvass plaintiff's own patrons while they were at plaintiff's bar; plaintiff could have questioned its own patrons who were seen at defendant's discotheque; plaintiff could have made inquiry of the source of alleged confusion among the various third parties whose statements, while not offered for their truth and therefore not hearsay, were not particularly convincing as evidence of actual confusion. Plaintiff's resolute failure to exploit opportunities to gather such evidence and the consequent failure to present such evidence may themselves help to prove by inference that there is neither actual nor potential confusion. *McGregor–Doniger Inc., supra*, 599 F.2d at 1136; *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 160 (S.D.N.Y. 1980) (Weinfeld, J.) (absence of consumer testimony and other evidence of actual confusion "invites an adverse inference").

6. *Defendant's Good Faith*—On the evidence presented both at the preliminary injunction hearing and at trial, there can be no serious doubt that defendant selected the name "Tunnel" in complete good faith as the name of a night spot to be housed in what had been a railroad tunnel, and was unaware of plaintiff's bar when it selected the name. A trademark search showed the name was available; plaintiff had not then filed the required Certificate of Conducting Business under an Assumed Name pursuant to N.Y. Gen. Bus. L. § 130(1) (McKinney 1988); plaintiff did not list the name of its bar in the telephone directory. In these circumstances, it is impossible to conclude that there was some intent to promote confusion that can be read as evidence that such confusion is likely to occur.

7 and 8. *Quality of Defendant's Product/Sophistication of the Buyers*—In this case I believe these indicia are properly considered together. Both the nature of the recreation offered at defendant's "Tunnel" and the cost to the consumer differ substantially from what is available at plaintiff's "Tunnel Bar," as set forth above. As the Second Circuit has pointed out:

> The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.

*McGregor–Doniger Inc., supra*, 599 F.2d at 1137. Moreover, the choice to spend time at a small bar where there is no dancing would appear to be qualitatively different from the choice to spend time at a large discotheque where there is dancing. The sharp difference in cost helps assure that such a choice in this case would be an informed one.[3] Accordingly, I find that the qualitative difference in what the parties

---

**3.** Defendant has argued that homosexuals generally are likely to exercise greater care than heterosexuals in choosing places of recreation because they wish to avoid being made to feel uncomfortable on account of their sexuality, an argument to some degree consistent with plaintiff's speculation that its reputation might suffer as the result of discomfort by those who, intending to visit plaintiff's "Tunnel Bar," might go instead to defendant's "Tunnel" on a night that is not a "gay night." Defendant's argument is plausible, but there is nothing in the way of evidence to support it. Absent evidence, I decline what I take to be an invitation to take judicial notice of differences in care and perhaps sophistication based on differences in sexual preference. *See* Rule 201(b), Fed.R.Evid.

offer consumers and the degree of focus those consumers bring to making their choice, which in this case is their level of sophistication, both lessen substantially the likelihood of any confusion.

For the above reasons, I find that plaintiff has failed to prove "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source" of the recreation offered at plaintiff's "Tunnel Bar," *Mushroom Makers, Inc., supra,* 580 F.2d at 47, and accordingly that no injunction is warranted.[4] Plaintiff's insistence to the contrary seems to arise substantially from an overly expansive view of what is protected by the "reverse confusion" doctrine. As plaintiff would have it, the doctrine exists to prevent "the vastly bigger Defendant from spoiling the value of the smaller senior user's mark by appropriating the public's recognition of the name in suit." Pl.Post–Trial Br. 1. However, once a determination is made that plaintiff and defendant are offering the public recreation that differs in ways that assure against a likelihood of confusion, then, as Judge Weinfeld wrote in *Information Clearing House, supra,* 492 F.Supp. at 163, granting plaintiff an injunction "would be tantamount to awarding it exclusive dominion over the use of the word [Tunnel], and the right to impair other parties' entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose." He then quoted an excerpt from the Supreme Court's opinion in *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97–98, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918) that bears repetition here:

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

\* \* \* \* \* \*

"The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly."

### III.

Plaintiff argues alternatively that it is entitled to injunctive relief on the second claim in its complaint, under New York's anti-dilution statute. N.Y.Gen.Bus. L. § 368–d (McKinney 1984).[5] There are three elements of such a claim: (1) distinctiveness of the mark, either that the mark is "truly of distinctive quality" or has acquired secondary meaning in the eyes of the public; (2) likelihood of dilution, either as the result of blurring of product identification or the tarnishing of an affirmative association that a mark has come to convey; and (3) predatory intent. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625–26 (2d Cir.1983). I believe plaintiff's proof fails on all three elements, but in any event there is simply no evidence whatever in the record that defendant " 'selected its mark with the express intent of trading on plaintiff's reputation.' " *Information*

---

4. Because an injunction is an equitable remedy, even if a likelihood of confusion were found a court would be justified in denying an injunction if other equitable factors, such as relative prejudice to the parties, militated against granting such relief. *Vitarroz, supra,* 644 F.2d at 969. However, inasmuch as the Lanham Act, even in a case of "reverse confusion," protects only against injury that results from confusion, *Banff, supra,* 841 F.2d at 487, it is unnecessary to consider other equitable factors once likelihood of confusion has been found not to exist.

5. That statute provides as follows: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

*Clearing House, supra,* 492 F.Supp. at 162 n. 44 (quoting *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 414–15 (S.D.N.Y.1974)). Therefore, even if I were inclined to accept at face value plaintiff's contention that its mark is well established and recognized in the gay community, and to credit its assertion that the blizzard of press clippings about defendant's "Tunnel" submitted by plaintiff both during and after trial establish a danger of dilution or tarnishment, plaintiff's claim would nonetheless fail.

## IV.

The above shall constitute my findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P. The injunction is denied and the complaint is dismissed.

SO ORDERED.