**PARENTING UNLIMITED INC., Plaintiff,**

v.

**COLUMBIA PICTURES TELEVISION INC., Capital Cities/ABC Inc. and The Weinberger Company, Defendants.**

**No. 90 Civ. 3905 (MJL).**

United States District Court, S.D. New York.

July 27, 1990.

**9.** Post judgment interest shall accrue at the rate    set forth in 28 U.S.C. § 1961 (1988).

222

Blum Kaplan, New York City by Stephen B. Pokotilow, Laura E. Goldbard, Mark P. Kesslen, for plaintiff.

Pryor, Cashman, Sherman & Flynn, New York City by Stephen F. Huff, Tom J. Ferber, Tina C. Kremenezky, for defendants.

## OPINION AND ORDER

LOWE, District Judge.

Before this Court is plaintiff Parenting Unlimited Inc.'s ("Parenting Unlimited") motion, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction enjoining defendants Columbia Pictures Television Inc. ("Columbia Pictures"), Capital Cities/ABC Inc. ("ABC") and The Weinberger Company ("Weinberger Company") from using plaintiff's federally registered trademark "BABY TALK" as the title of defendants' upcoming television program and from using the trademark to advertise or promote the television program. For the reasons set forth below, plaintiff's motion is denied.

## BACKGROUND

Plaintiff Parenting Unlimited and its predecessors have been distributing a magazine under the title BABY TALK since 1935. Complaint at ¶ 9. That title is also a registered trademark belonging to Parenting Unlimited[1] which was issued in 1958 for use in the magazine field—Class 38.

BABY TALK Magazine is America's oldest baby magazine and contains articles relating to diversified advice to parents from experts, "how-to" information and product information. Several distinguished organizations contribute regular features to the magazine. Affidavit of Richard Huttner ("Huttner Aff.") at ¶ 9. Indeed, the magazine's own Board of Professional advisers includes several renown medical and psychological experts. *Id.*

BABY TALK Magazine's current circulation is 1,050,000 copies per month. *Id.* at ¶ 5. Notwithstanding its broad circulation, BABY TALK Magazine is not available, as most magazines are, at newsstands or by subscription. Rather, the magazine is received by mass merchandisers who, in turn, sell copies of the magazine to diaper services, obstetricians' and pediatricians' offices, childbirth education classes, and hospitals. *Id.* at ¶ 8. The magazine is also distributed in the baby department of every Sears' store and other selected department stores. By plaintiff's own admission, BABY TALK

---

1. United States Trademark Registration No. 31,-404. *See* Complaint, Exhibit 1.

Magazine is read by a limited and specific segment of the population: expectant parents and the parents of infant children, to whom the magazine is available at no cost. *Id.* at ¶ 10.

Because the magazine is distributed to potential readers at no cost, BABY TALK Magazine relies substantially on advertising revenues from some of the largest companies in the United States, including Beech–Nut and Fisher Price. *Id.* at ¶ 11. Plaintiff claims that these advertisers immediately recognize the mark BABY TALK in connection with its magazine. *Id.*

Plaintiff has also entered into licensing agreements with third parties for use of the mark BABY TALK. For example, it is currently licensing the mark to a toy manufacturer which markets a doll under the name BABY TALK doll. Complaint at ¶ 12. In addition, plaintiff claims to have begun a very limited expansion into the television market, where it has produced several two to three minute informational television "spots" for the weekday talk show "Everyday with Joan Lunden." [2] *Id.*

Defendant Weinberger Company, in cooperation with defendant Columbia Pictures, is currently producing a new television program entitled BABY TALK, which is to be broadcast by defendant ABC in a Tuesday night prime time slot in the upcoming Fall 1990 television season. The television program, a thirty minute situational comedy ("sitcom"), is about—as its title suggests—a talking baby who reveals his thoughts, to the audience only, through a voice over technique. The program is based upon the hugely successful theatrical movie entitled "Look Who's Talking," which was produced by Tri–Star Pictures ("Tri–Star").

According to Ed Weinberger, President of defendant Weinberger Company, Tri–Star agreed to allow defendants to produce a program based on the movie, but would not allow them to use the title "Look Who's Talking." Affidavit of Ed Weinberger ("Weinberger Aff.") at ¶ 6. Weinberger claims to have thereafter chosen "BABY TALK" as the title for his program because it was descriptive of the program's theme and because it was a short, common English expression and therefore easy for the audience to remember. *Id.* at ¶ 7. A title search conducted by the Legal Affairs department of Columbia Pictures revealed that there was no prior registration of the title in connection with television entertainment services—Class 41.[3] Affidavit of Gregory K. Boone at ¶ 3. Weinberger further maintains that he was unaware of the existence of BABY TALK magazine until the inception of this controversy and that the magazine's title therefore played no part in his selection of the name for his sitcom. Weinberger Aff. at ¶ 9.

Plaintiff later learned about defendants' upcoming program through media announcements. Huttner Aff. at ¶ 13. Fearing defendant's use of the title BABY TALK would infringe on its registered mark and generate confusion about plaintiff's affiliation with the sitcom, plaintiff made several informal efforts to get the defendants to discontinue use of the title. Affidavit of Laura E. Goldbard at ¶¶ 2–5. Several letters were exchanged, but plaintiff's efforts were to no avail.[4] *Id.*, Exhibits 1–4 and 6–7. Plaintiff thereafter commenced this action in early June, asserting federal statutory claims for trademark infringement under Section 32(1) of the Lan-

---

2. Defendant contends that only three of these spots were ever broadcast, that they have not been aired since April 1990, Plaintiff's Memorandum of Law at 7–8, and that the spots constituted nothing more than ordinary television advertisements. Transcript of Hearing ("Tr.") at 65. Plaintiff disputes this characterization of its foray into television and contends that these spots will be broadcast again as part of summer reruns of "Everyday with Joan Lunden." Supplemental Affidavit of Richard Huttner ("Supp. Huttner Aff.") at ¶ P.

3. Defendant subsequently filed a request for the registration of BABY TALK in connection with television entertainment services (Class 41) and dolls, action figures and plush toys (Class 28). Defendant has since amended this application to delete the Class 28 request. Affidavit of Stephen E. Huff ("Huff Aff."), Exhibit J.

4. Before the litigation commenced, defendants offered placement of a disclaimer in the television program, but plaintiff rejected that suggestion. Tr. at 80, 86–87.

ham Act, 15 U.S.C. § 1114(1), and for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff also seeks relief under three pendent state claims for trademark infringement and unfair competition under New York common law and for dilution of its trademark under Section 368–d of the New York General Business Law. On July 3, 1990, this Court held a formal hearing on plaintiff's application for a preliminary injunction.

## DISCUSSION

■ In order to obtain a preliminary injunction in this Circuit, plaintiff has the burden of showing:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.

*American Cynamid Co. v. Campagna Per Le Farmacie In Italie S.P.A.*, 847 F.2d 53, 54–55 (2d Cir.1988). The award of a preliminary injunction is an extraordinary remedy and will not be granted absent a clear showing that the moving party has met its burden of proof. *See, e.g., Beech–Nut v. Warner Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973); *Karmikel Corp. v. May Department Stores*, 658 F.Supp. 1361, 1367 (S.D.N.Y.1987).

### A. Irreparable Harm

"Perhaps the most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be granted." *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985). To demonstrate irreparable harm, plaintiff must therefore provide more than "mere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage." *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 759 (2d Cir.1979); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 (1973).

Because of our ruling on plaintiff's chances of success on the merits of its claims, *see* discussion *infra*, the usual presumptions of irreparable harm are unavailable here. *Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, 1314 (2d Cir.1987). The only direct proof [5] of irreparable harm proffered by plaintiff is a series of letters authored by four of the magazine's advertisers and one of the magazine's distributional outlets which express concern about the impact of defendants' sitcom on the marketability of plaintiff's magazine.[6] Supp. Huttner Aff., Exhibits 1–2. It is important to note, however, that, with the possible exception of one author, none of the letters are reflective of the advertisers' own confusion about defendants' use of the BABY TALK title.[7] In addition, none of the letters, with one possible exception,[8] actually threatens

---

**5.** "If the element of irreparable harm is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success on the merits, *need for proof of irreparable damage is even more pronounced.*" *Jack Kahn Music*, 604 F.2d at 757 (emphasis supplied).

**6.** Plaintiff admits to soliciting these letters in discussions with advertisers and distributors, but denies drafting the letters or suggesting specific language for them. Supp. Huttner Aff. at ¶ F. Plaintiff contends that he only informed each person of defendants' plans to broadcast a sitcom named BABY TALK and then asked them to express their thoughts on the subject in writing. *Id.*

**7.** Only one letter expresses any confusion, albeit vague, as to defendants' use of the title BABY TALK. However, given the sophistication of advertising executives and the highly structured manner in which advertising decisions are made, it is doubtful that such an assertion is the final and considered opinion of the author. In an analogous case, Judge Weinfeld discounted the testimony of an experienced advertising executive as "hyperbole" since it "[taxed] credulity beyond belief." *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 163 (S.D.N.Y.1980).

**8.** That letter merely states "Please keep us informed as to the status of the situation with both *the television program and your magazine* so that we can advise our clients to act appropriately in their best interest." Supp. Huttner Aff., Exhibit 1.

to withdraw support for the magazine in the event of defendants' continued use of the mark at issue here. However, even were we to assume this result, plaintiff has not necessarily made out a case of *irreparable* loss of advertising revenues. Plaintiff has not submitted specific evidence regarding the total source and amount of its advertising revenues [9] or the probability that other advertisers will fill the gap left by these authors. Thus, while some harm to the magazine may result from defendants' usage—and that is a very substantial assumption given the vague and cursory language of the few letters submitted and the enduring and specialized relationship of these advertisers to the magazine— there is no proof in the record of irreparability.

## B. Likelihood of Success on the Merits

In order to prevail on its claim of trademark infringement under the Lanham Act, plaintiff bears the burden of proving that it owns a valid trademark and that defendants' use of this trademark does or will create a "likelihood of confusion among consumers." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines,* 753 F.2d 14, 17 (2d Cir.1985).

While, in the instant case, it is undisputed that plaintiff owns a federally registered trademark in the title BABY TALK for use in the magazine field, that fact alone "does not give [plaintiff] the right to absolute protection of the mark." *Karmikel,* 658 F.Supp. at 1368. The essential inquiry in any trademark infringement action is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." [10] *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987). "Confusion" is broadly

defined to mean confusion as to source, sponsorship, affiliation or identification. *See Dallas Cowboys Cheerleaders v. Pussycat Cinema,* 604 F.2d 200, 204–205 (2d Cir.1979). Because likelihood of confusion is an essential element of all of plaintiff's stated claims for relief—with the exception of its claim under New York's anti-dilution statute—we take some pains here to set forth and analyze the relevant criteria.

Where the parties' products are different, as they are here, the likelihood that consumers will be confused by use of the same mark in connection with those products is a function of many variables, no single one of which is determinative. These factors include:

> the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). We will examine each of those variables in turn.

### Strength of Plaintiff's Mark

Strength refers to "the distinctiveness of the mark, or more precisely, its tendency to identify goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger,* 599 F.2d at 1131. Courts examine two factors to determine the relative strength of a particular mark: its placement on the spectrum of marks and its marketplace recognition value. *Karmikel,* 658 F.Supp. at 1369.

---

**9.** A review of the last seven issues of plaintiff's magazine indicates that of the approximately 143 advertisements appearing, only thirty five were placed by the letters' authors.

**10.** When the Second Circuit speaks of an "appreciable number of reasonable consumers," it requires that plaintiff demonstrate that a "significant number" of customers are likely to be

misled. *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1138 (2d Cir.1986). "The remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us ... The purchasing public must be credited with at least a modicum of intelligence." *Id.*

There is little question that plaintiff's mark is neither generic nor arbitrary/fanciful. Rather, the present controversy centers upon the sometimes elusive distinction between descriptive and suggestive terms, the latter of which is entitled to greater protection. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Contending that BABY TALK "conveys an immediate idea of the ingredients, qualities or characteristics" of plaintiff's magazine, defendants urge that the trademark is merely descriptive and may therefore be protected only upon a showing of secondary meaning. *See McGregor–Doniger*, 599 F.2d at 1131. Plaintiff, on the other hand, argues that its title is suggestive because it requires imagination, thought and perception to reach the conclusion that BABY TALK is a magazine.

A mark need not be descriptive of the actual product in order to be deemed a "descriptive" term, however, so long as the mark conveys an immediate idea of the *content* or *characteristics* of that good. In the instant case, BABY TALK may not describe a magazine, but it most certainly conveys an immediate idea of the contents of that magazine—talk about babies—in the same way a hypothetical magazine title "Computer Talk" would convey an immediate idea that the publication concerns computers.

Even if BABY TALK is deemed a suggestive term, however, it might nonetheless be entitled to only a modicum of trademark protection where there is little proof of secondary meaning. *See Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981) (the District Court was entitled to consider the absence of such evidence a factor weighing against a finding of likelihood of confusion, even where the mark was deemed suggestive); *Narwood Productions v. Lexington Broadcast Services*, 541 F.Supp. 1243, 1249 (S.D.N.Y. 1982). "A mark acquires secondary meaning when it [is] shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer ... Thus the crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods, even though the relevant consuming public might not know the name of the producer." *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1221 (2d Cir.1987) (citations omitted). The factors a Court may consider in determining whether the trademarked title of a magazine has acquired secondary meaning include circulation size, geographic distribution, length of time of publication and association in the public mind with the magazine or publisher. *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 379 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986) (citing *C.L.A.S.S. Promotions*, 753 F.2d at 17–18).

Judged by these criteria, we conclude that BABY TALK lacks a strong secondary meaning. While the magazine's fifty-five year publication history and its current monthly circulation appear sizable in the abstract, the fact is that BABY TALK's audience, when compared to the audience of most other magazine publications, is relatively small. *See* Simmons' 1989 Study of Media & Markets, Huttner Aff., Exhibit 4. By plaintiff's own admission, that audience also represents a very specific and limited segment of the population—expectant couples and parents of infant children—whose interest in the magazine, quite naturally, is itself of very short duration. *See* Huttner Aff. at ¶ 10. While the magazine no doubt has significant selling power within this group, "[t]he fact that a mark has selling power in a limited ... commercial area does not endow it with a secondary meaning for the public generally." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A.*, 875 F.2d 1026, 1030 (2d Cir.1989). Also relevant to our determination here is the unconventional manner in which the magazine is distributed. As previously indicated, the magazine is not sold and displayed at newsstands or bookstores where it might be detected by members of the general reading public who, though not necessarily interested in the magazine's contents, may nevertheless come to recognize the term BABY TALK in association with the publication. The magazine's unusual distributional outlets—diaper servic-

es, obstetricians' offices, baby departments—virtually insure that the magazine's exposure will be limited to its narrow target audience. Given these considerations, we conclude that while the mark BABY TALK may have significant selling power within its limited market, it has nevertheless failed to acquire a secondary meaning among the general population.

Finally, the strength of plaintiff's mark is further diluted by extensive third party usage, as demonstrated by a recent title report conducted by the defendants. While third party usage of a mark "on products or services totally unrelated to the owner's use is of little or no probative value," *Transamerica Corp. v. Trans America Abstract Services,* 698 F.Supp. 1067, 1072 (E.D.N.Y.1988), it is significant here that a number of books and publications by that title, extending as far back as 1899, are—like plaintiff's magazine—of a serious nature and concern the subject of childcare. *See* Huff Aff., Exhibit C.

Similarity Between the Marks

In assessing similarity between marks, the focus is on "the general impression conveyed by the two marks," and their effect on "prospective purchasers." *McGregor–Doniger,* 599 F.2d at 1133–34. While defendants' mark, in the instant case, is identical to plaintiff's both phonetically and in spelling, there are several visual differences in logo design and typeface which weaken plaintiff's claim of *absolute* similarity. *See, e.g., C.L.A.S.S. Promotions,* 753 F.2d at 18; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1339 (2d Cir. 1975). For example, the masthead of plaintiff's magazine appears on one line and in lower case letters [11] while, on the sitcom's on-air promotions, the word "baby" appears in upper case letters on colored baby blocks with the word "talk" appearing in script directly beneath it. In addition, there are monumental differences in the content, style and target market of the parties' products, *see* discussion *infra,* which no doubt color the general impres-

sions conveyed by their marks. *See, e.g., Playboy Enterprises v. Chuckleberry Publishing,* 486 F.Supp. 414, 421–22 (S.D.N.Y. 1980), *aff'd,* 687 F.2d 563 (2d Cir.1982) (PLAYBOY with its heterosexual male audience is not as similar to BLUEBOY (homosexual male), PLAYGUY (homosexual male), PLAYGIRL (heterosexual female) or PLAYERS (heterosexual black male) as it is similar to PLAYMEN with its *identical* heterosexual male audience). While, for the purposes of this factor, we find the overall similarity of the marks outweigh these differences, they are nevertheless relevant to our ultimate assessment of the likelihood of confusion. "Similarity in and of itself is not the acid test." *McGregor–Doniger,* 599 F.2d at 1133.

Proximity of the Products and Plaintiff's Likelihood of Bridging the Gap

In assessing the proximity of the parties' products, a court should examine differences in their respective content, style, geographic distribution, market position and audience appeal. *See C.L.A.S.S. Promotions,* 753 F.2d at 18. Judged by these criteria, we find that this factor weighs overwhelmingly in favor of the defendants. To begin at the most fundamental level, the parties are engaged in completely different fields—fields which the United States Patent Office itself, through its classification system, recognizes as distinct. Plaintiff is producing a magazine; defendants are producing a television program. *See Vitarroz,* 644 F.2d at 967. (BRAVO'S crackers are not closely related to BRAVOS tortilla chips since they are shelved in different sections of retail food stores); *Narwood Productions,* 541 F.Supp. at 1250 ("That the programs are broadcast over different mediums enlarges the competitive distance between them"). The differences between the parties' products are, however, more profound than this simple distinction indicates. Plaintiff's magazine is an educational one, designed to inform and advise new or expectant parents on child-rearing. Its content is serious, journalistic, even authoritative. By contrast, defendants' program

---

11. It should be noted, however, that, as of its March 1990 issue, plaintiff's masthead appears

in upper case letters and the mark is underlined. Plaintiff's Hearing Exhibits 3–7.

is designed purely to entertain. Its content may be described as creative, humorous and fictional, and is by no means educational or informative. These distinctions in content and medium illuminate differences in the respective products' market positions and audience appeal. Defendants' program is to be broadcast in a ubiquitous medium, on a national network and in a popular television time slot. The placement of the program in that slot is no doubt intended to generate broad and intragenerational audience appeal. While plaintiff's magazine is also distributed nationally, the manner through which it reaches its audience is decidedly selective and virtually insures that only those who require the services of a children's clothing department, obstetrician or diaper service have access to the magazine. While there may be some overlap between this and defendants' much greater audience, at this stage of the proceedings, that issue remains a matter of pure conjecture.

The aforementioned differences in the products' style and content also inform our assessment of whether plaintiff will bridge the gap by entering into the television market. As evidence of this likelihood, plaintiff points to its production of several informational spots on the daytime program "Everyday with Joan Lunden," as well as the current plans of a comparable magazine, AMERICAN BABY, to produce a television program mirroring its serious format. Supp. Huttner Aff. at ¶ N.

When courts speak of "bridging the gap," they are referring to two different scenarios:

> The first is that the senior user presently *intends* to expand his sales efforts to *compete directly* with the junior user; likelihood of confusion is created by the likelihood that the two products will be directly competitive. The second possibility is that, while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies.

*Lambda Electronics v. Lambda Technology Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y. 1981) (citing *McGregor–Doniger*, 599 F.2d at 1135–36) (emphasis supplied).

Plaintiff's past and tentative sojourn into the television market, however, is not evidence of a *present* intention to compete directly with defendants' situational comedy. Production of a fictional comedic program—or anything even remotely akin to defendants' product—by a serious and reputable magazine, in the first instance, strikes us as implausible. However, even if this were likely, such an effort would completely undermine plaintiff's expressed concern that the frivolity of defendants' sitcom will tarnish the magazine's reputation for serious and authoritative journalism. The fact is that plaintiff has not expressed any present intention of producing a program directly competitive with defendants'. If AMERICAN BABY's proposed expansion into the television field is indicative of anything—and it is certainly not reflective of plaintiff's *own* corporate ambitions—it is that a serious magazine will tend to maintain its serious format when venturing into other mediums. This is certainly what BABY TALK magazine's own sojourn into television illustrates.[12] *See, e.g., National Lampoon v. American Broadcasting Companies, Inc.*, 376 F.Supp. 733, 746 (S.D.N.Y.1974) (plaintiff humor magazine had commenced production of a similar humor program for closed circuit television); *Comic Strip Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 979 (S.D.N.Y.1989) (plaintiff comedy club chain was formulating a television program to provide similar entertainment services). For these very reasons, we also find it unlikely that consumers will assume that the parties are related companies.

Actual Confusion

Although "there can be no more positive proof of confusion than evidence of actual confusion." *Lambda Electronics*, 515 F.Supp. at 926, such evidence is not required in order to prove a likelihood of confusion. *Ideal Industries v. Gardner–*

---

**12.** It will be remembered that plaintiff's episodes were produced in conjunction with an informational talk show which was aired during the weekday, during working hours.

*Bender, Inc.*, 612 F.2d 1018, 1024 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Because the sitcom has not yet been broadcast, it would be extremely difficult, at this juncture, for plaintiff to come forward with such data, although numerous media reports concerning the upcoming program do not appear to have generated any actual confusion about plaintiff's sponsorship or affiliation with the sitcom.[13] Accordingly, while this factor weighs in defendants' favor, we do not accord it great weight in our determination.

Sophistication of Consumers

In a case involving different media vehicles, the principle groups of potentially confused consumers are readers/viewers and advertisers. *See Inc.*, 616 F.Supp. at 386; *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. at 163 (S.D.N. Y.1980). With respect to the former group, it has been held that readers of magazines distributed free of charge are assumed to be unsophisticated and thus prone to confusion. *See Vision, Inc. v. Parks*, 610 F.Supp. 927, 932 (S.D.N.Y.1985). However, such a presumption, in the instant case, is at least partially offset by the equally persuasive assumption that "readers of newspapers and periodicals of a serious nature" may be considered "careful and discriminating." R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 81.2 (3d ed. 1969). This presumption is particularly operable here where the magazine's readership consists of expectant and new parents cautious about advice on the care of something as personal and dear to them as their newborn children. On the other hand, members of the general primetime television viewing public cannot claim such distinctions. As such they may be prone to reverse confusion.

However, the most relevant consumer group in a trademark case involving a magazine and a television program are advertisers. *See Centaur Communications*, 830 F.2d at 1217; *Narwood Productions*, 541 F.Supp. at 1251. There is little question that major corporations and advertising agencies are extremely sophisticated and

are therefore quite capable of distinguishing between plaintiff's magazine and defendants' comedic television series. *Inc.*, 616 F.Supp. at 386–87 ("Given this wealth of information and interlocking levels of responsibility for recommending and placing ads, I consider it most unlikely that an advertiser would place an ad in [the] magazine 'Manhattan, inc.' under the mistaken impression that he was advertising in [the] magazine 'Inc.' "). "An advertising executive purchasing advertising space is not an impulse buyer and is unlikely to be confused as to the publication in which he is placing an ad." *Vision*, 610 F.Supp. at 932. On this score, the letters sent by several BABY TALK magazine advertisers and distributors do not reflect their own actual confusion, but only their concern about *potential* confusion on the part of readers. They therefore merit no attention in the analysis of this *Polaroid* factor, which we find weighs in defendants' favor.

Defendant's Intent in Adopting Its Mark

The Second Circuit defines, "an 'innocent' or a bona fide junior user ... [as] one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trade-mark." *Triumph Hosiery Mills v. Triumph International*, 308 F.2d 196, 199 (2d Cir.1962). In the instant case, plaintiff contends that defendants adopted the mark BABY TALK with the specific intention of trading on the commercial success of plaintiff's trademark and of misappropriating the reputation and goodwill which has attached to it. Plaintiff also points to defendants' persistent use of the mark, after repeated warnings by plaintiff against its use, as evidence of their bad faith.

There is, however, no evidence that defendants had any knowledge of plaintiff's trademark when BABY TALK was initially selected by Ed Weinberger as the title for his series. Indeed, Weinberger has submitted an uncontroverted affidavit in which he states that he was unaware of the existence of BABY TALK magazine until this controversy ensued. Weinberger's explanation as to how he independently arrived

---

**13.** Because of our previous findings as to proximity and bridging the gap, the Court rejects

plaintiff's suggestion that actual confusion is inevitable.

at the title of the program is entirely credible. *Compare Kiki Undies Corp. v. Promenade Hosiery Mills*, 411 F.2d 1097 (2d Cir.1969) (defendant required to carry burden of persuasion since it made *no* substantial attempt to explain the genesis of its usage of the mark).

Moreover, defendants' continued use of the mark after learning of plaintiff's prior registration in the magazine field and in the face of plaintiff's vehement protests is not evidence of bad faith. A defendant's mere knowledge of a potential problem with its mark does not necessarily connote bad faith. *See Essence Communications v. Singh Industries*, 703 F.Supp. 261, 269 (S.D.N.Y.1988). In the instant case, defendants relied on advice of counsel from the outset and should not be deemed to have acted in bad faith purely on the basis of plaintiff's contention that their assessment of the mark's availability was incorrect. *Triumph Hosiery Mills*, 308 F.2d at 199 ("Surely, error of an alleged infringer ... in forecasting the decision of the ultimate arbiter is not a species of bad faith which constitutes independent and substantive proof of infringement"); *Information Clearing House*, 492 F.Supp. at 161–62. Accordingly, we find this factor weighs in defendants' favor.[14]

Quality of Defendant's Product

Because neither party directly addresses this last *Polaroid* factor, we deal with it here only briefly. As this Circuit has previously commented, dissimilarity in the quality of the parties' products *lessens* the threat of likelihood of confusion. *Plus Products v. Plus Discount Foods*, 722 F.2d 999, 1008 (2d Cir.1983) ("the marked difference between the quality of plaintiff's and defendant's *non-competing goods* reduces rather than increases the likelihood of confusion") (emphasis supplied); *Transamerica*, 698 F.Supp. at 1076. We have reviewed the contents of both the sitcom and the magazine and find them to be utterly dissimilar in quality. *See* Hearing Transcript at 26.[15] Accordingly, this Court finds this *Polaroid* factor also favors defendants.

Conclusion as to Likelihood of Confusion

For the aforementioned reasons, this Court finds that plaintiff has failed to prove a sufficient likelihood of confusion so as to entitle it to the equitable relief it seeks under the Lanham Act. As previously stated, because such a showing is elemental to plaintiff's pendent claims for trademark infringement and unfair competition under New York common law, *see Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983), we similarly decline to issue a preliminary injunction under those causes of action. We now turn to our analysis of the background facts under New York's anti-dilution statute.

*C. New York General Business Law Section 368–d*

■ Count Five of the Complaint asserts a claim under the New York anti-dilution statute.[16] Unlike the previously discussed claims, plaintiff is not required to demonstrate a likelihood of confusion to succeed on this claim. On the other hand, much of our previous analysis is relevant here, for in order to prevail under § 368–d, plaintiff must show: 1) that its mark possess a

---

**14.** "In the absence of any evidence suggesting the presence of these motives, courts usually find the defendants acted in good faith." *Karmikel*, 658 F.Supp. at 1375 (citation omitted).

**15.** The light-hearted, non-competitive nature of the sitcom clearly distinguishes this case from *WGBH Educational Foundation v. Penthouse International*, 453 F.Supp. 1347, 1352 (S.D.N.Y. 1978), where the Court found that a magazine named "Nova," which sought, under the guise of science journalism, to titillate its readers with science fiction, fantasy, the occult and UFO's, posed a threat to a "serious" science public television program of the same name. Clearly, a "silly" sitcom about a talking baby which merely seeks to *entertain* does not threaten a magazine with a serious *journalistic* mission to educate parents about the care of newborns.

**16.** The statute provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1984).

distinctive quality capable of dilution and 2) that there is, in fact, a likelihood of dilution.[17] *Mead Data Central v. Toyota Motor Sales, U.S.A.,* 875 F.2d 1026, 1030 (2d Cir.1989).

"Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Id.* The mark must possess a strong name that has either a distinctive quality or a secondary meaning. *Little India Stores v. Singh,* 101 A.D.2d 727, 475 N.Y.S.2d 38, 40 (1st Dep't 1984). In the instant case, however, we have already ruled that plaintiff's mark is merely descriptive of the magazine and, even if deemed suggestive, lacks a secondary meaning for the public generally. *Mead Data Central,* 875 F.2d at 1030 ("However, the mere fact that a mark ·has selling power in a limited geographical or commercial area does not endow it with a secondary meaning for the public generally."). Accordingly, we find that BABY TALK is not sufficiently distinctive to warrant injunctive relief under the anti-dilution claim. *See Id.* at 1033 (Sweet, D.J., concurring) ("A trademark has distinctive quality if it is 'distinctive, arbitrary, fanciful or coined' rather than generic or descriptive.") (citation omitted); *Sally Gee, Inc. v. Myra*

*Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) ("perhaps not even all [marks] that qualify as arbitrary or fanciful" are entitled to § 368–d's protection); *Sage Realty Corp. v. Sage Group, Inc.,* 711 F.Supp. 134, 143 (S.D.N.Y.1989) ("only the strongest, most well-established marks are protected by § 368–d against dilution").

Because of our finding on this first element, we need not consider plaintiff's claim of likelihood of dilution. Even assuming the purported "silliness" of defendants' sitcom might somehow tarnish the magazine's reputation for serious journalism,[18] plaintiff's mark is not sufficiently distinctive to afford it the degree of protection demanded on this motion.[19] Moreover, while proof of predatory intent is not dispositive, there is also no evidence in the instant case that defendants' adoption of the BABY TALK title was so motivated. *See* discussion *supra* at 229–230.

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied.

It Is So Ordered.

**17.** There is some disagreement among courts as to whether a so-called third element of predatory intent is a requisite element or merely a relevant but not conclusive factor. *Compare, e.g., Lobo Enterprises, Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 79 (S.D.N.Y.1988) *with Hoover Co. v. Citicorp Venture Capital Ltd.,* 674 F.Supp. 460, 462 (S.D.N.Y.1987). The most recent pronouncement of our Circuit on this subject is that, while not an independent element of this cause of action, predatory intent remains a relevant factor when considering likelihood of dilution. *Mead Data Central,* 875 F.2d at 1037. Also relevant to the analysis here, as in our preceding discussion, is the degree of similarity between the marks and the sophistication of plaintiff's consumers. *Id.* at 1029, 1036–37.

**18.** We nevertheless express our considerable skepticism as to the force of this claim when the background facts of this action are compared to other actions under the statute. *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema,* 604 F.2d 200, 204–205 (2d Cir.1979) (association of "wholesome" football cheerleaders with X-rated film, "Debbie Does Dallas"); *Coca–Cola Co. v. Gemini Rising Inc.,* 346 F.Supp. 1183, 1189 (E.D. N.Y.1972) ("distasteful" depiction of the word

"Cocaine" in the well-known red-and-white Coca–Cola design); and *Chemical Corp. of America v. Anheuser Busch, Inc.,* 306 F.2d 433 (5th Cir.1962), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) ("unwholesome" association between beer slogan, "Where there's life, there's Bud," and chemical company slogan, "Where there's life, there's bugs"). On the other hand, in an analogous trademark infringement case, the Court found ·that the use of the "Kent" mark on cigarettes did not tarnish the reputation of "Kent" brushes since, "[t]he day has long passed when cigarette smoking is considered offensive and sinful." *G.B. Kent & Sons v. P. Lorillard Co.,* 114 F.Supp. 621 (S.D.N.Y. 1953), *aff'd per curiam,* 210 F.2d 953 (2d Cir. 1954).

**19.** A finding that the product identification of plaintiff's mark will be "blurred" by defendants' usage of the BABY TALK title is certainly not warranted here. Such blurring presumes that there "be some mental association between plaintiff's and defendant's marks"—a phenomenon wholly unlikely where, as with the mark LEXIS, plaintiff's mark "circulates only in a limited market." *Mead Data Central,* 875 F.2d at 1031.